# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RONDA HARRIS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 10-CV-621-PJC ) |
| MICHAEL J. ASTRUE, Commissioner of the Social Security Administration, | ) ) ) ) |
| Defendant. | ) |

## OPINION AND ORDER

Claimant, Ronda Harris ("Harris"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Harris' application for disability benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq*. In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge. Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Harris appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Harris was not disabled. For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

Harris was 33 years old at the time of the hearing before the ALJ on November 13, 2009. (R. 30, 34). She had a high school diploma. (R. 35).

Harris testified that she quit working at a call center in 2008 due to fibromyalgia and pain that made it impossible for her to sit long enough to work a four-hour day. (R. 35-37). The

company had tried to accommodate her by giving her a 5-minute break every hour, but she couldn't sit for the one-hour period due to the pain. (R. 36).

Harris testified that she also had problems working due to carpal tunnel syndrome, which was worse in her right hand. (R. 37). She had lost her grip with her right hand at times, and it made it difficult for her to do things with that hand. (R. 39). She showed signs of thoracic outlet syndrome, which caused pain down her right arm, her sides, and her clavicle area. (R. 37). She had numbness in her hands. *Id.* Her feet swelled, and her legs hurt. *Id.* She had pain in her back. *Id.* She had anxiety and depression. *Id.*

Sitting or standing in one position for too long made her pain worse. (R. 37-38). It was also difficult for her to work at a computer or to write with a pen due to the pain that caused. *Id.* On her home computer, Harris could only work for about 10 minutes, due to an inability to sit or type for longer than that. (R. 43). To help her pain, Harris had to stop any activity she was doing and rest, sometimes lying down. (R. 38). She also had to take pain medication. *Id.* She estimated that she spent 30 to 40 per cent of her day lying down. *Id.* If she didn't lie down that much, she would be in extreme pain. *Id.*

The length of time that she could stand or walk would depend on how she felt that day, but Harris estimated she could stand or walk for 15 to 25 minutes. *Id.* After that, she would need to sit to rest for about 15 minutes before getting up again. *Id.* She could sit for about 10 to 15 minutes before she would start hurting. (R. 38-39).

She did light cleaning at her house, but her children or her husband did most of the cleaning. (R. 39). Doing light cleaning, she would have to stop after about 10 to 15 minutes due to discomfort. *Id.* She used to cook, but at the time of the hearing she didn't cook any more. *Id.* She could do easy cooking like microwave dinners, but otherwise her family had to prepare their

own meals. (R. 39-40). She used to do the grocery shopping, but at the time of the hearing her husband usually did it. (R. 40). She didn't shop because she couldn't stand for long and it caused her extreme pain. *Id.* In turn, her anxiety about the pain made her irritable, so she avoided the situation. *Id.* Some personal grooming tasks that required putting her hands over her head or fine manipulation were difficult for her due to pain and numbness. (R. 41).

Harris testified that she had only sporadically been treated for mental health issues due to insurance coverage difficulties, financial difficulties, and lack of providers in her area. (R. 40-41). At the time of the hearing, she was receiving mental health care at Grand Lake. *Id.*

Due to her pain, Harris was more secluded than she had been previously. (R. 41). She and her family had previously attended church regularly, but at the time of the hearing attended sporadically depending on how she had slept and her pain level. (R. 41-42). She had difficulty going to her children's school activities because she couldn't sit on bleachers and she could not sit for the length of the event. (R. 44-45). She was more nervous around strangers than she had been previously. (R. 42). She did some reading, but she had difficulty concentrating. *Id.* Watching television was also hard due to difficulties concentrating and due to her need to change positions frequently. (R. 43). She wrote in a notebook to remind herself of bills that needed to be paid, and she had previously not needed to use a notebook for that task. (R. 45).

Harris testified that her previous Louisiana driver's license had expired, and she had not gone to get an Oklahoma driver's license due to her pain and anxiety. (R. 45-46). She did not drive, and her husband drove her places. (R. 45).

Physical therapy that included massage or heat gave her temporary relief from her pain that day, but the next day her pain would be back. (R. 42-43). She took multiple medications for pain, inflammation, and anxiety, but they did not control her pain enough for her to be able to

function as she had previously. (R. 43).

Harris testified that she went to bed at 2 a.m. (R. 43-44). She would sleep for a few hours, and then she would awaken due to stiffness or pain. *Id.* She would then be awake for a while before she would go back to sleep. (R. 44). She also slept during the day. *Id.*

Harris saw Michael L. Bumpus, M.D. on May 10, 2007 for a chief complaint of "hurting all over body again." (R. 224). The hand-written notes of the examination are not completely legible, but it appears that the diagnosis was myalgias and that laboratory tests were ordered. *Id.* Harris was seen again on July 31, 2007 with a chief complaint of possible shingles, and it appears that the diagnosis also may have been shingles. (R. 223). On August 21, 2007, Harris still had a rash, but requested a release to return to work. (R. 222).

On February 5, 2008, Harris returned with a chief complaint of right arm and shoulder pain. (R. 221). On February 19, 2008 and February 29, 2008, Harris was seen by Dr. Bumpus for a follow up of neck pain. (R. 220).

Sri K. Reddy, M.D. conducted EMG / NCS testing of the right upper extremity on February 27, 2008, and the result was a normal study. (R. 396-97). An MRI study of Harris' cervical spine also conducted on February 27, 2008 was considered normal. (R. 400).

On March 11, 2008, Harris returned to Dr. Bumpus complaining of right arm pain. (R. 218). The hand-written notes of this visit appear to state that Harris had attempted to work half days, but was in too much pain to work. *Id.*

At the referral of Dr. Bumpus, Harris saw Jay L. Bryngelson, M.D. at Orthopaedic Surgery on March 17, 2008. (R. 147-49). Dr. Bryngelson's opinion was that the x-rays of Harris' cervical spine showed bony prominences and other structures that might compromise her thoracic outlet, and he therefore believed that the best working diagnosis was thoracic outlet

4

syndrome. *Id.* He recommended physical therapy and continued use of ibuprofen, and he referred Harris to Dr. Pettingell for further testing. *Id.*

Records indicate that Harris attended physical therapy sessions at Bartlesville Physical Rehabilitation from March 18 to May 15, 2008. (R. 150-216).

On March 28, 2008, Tim Pettingell, M.D. conducted an examination and testing of Harris. (R. 141-44). Dr. Pettingell's conclusion was that his studies did not provide any electrodiagnostic evidence of right neurogenic thoracic outlet syndrome. (R. 144). Dr. Pettingell's opinion was that Harris presented with right carpal tunnel syndrome and that his study was consistent with mild right carpal tunnel syndrome. *Id.* He provided Harris with a right carpal tunnel splint. *Id.*

At a follow-up visit with Dr. Bryngelson on April 7, 2008, Harris was using a wrist splint at night that had been given to her by Dr. Pettingell. (R. 148). Harris felt she was improving with the splint and physical therapy. *Id.* Dr. Bryngelson planned to administer a cortisone injection if Harris' symptoms did not fully abate. *Id.*

Harris presented to the emergency room at Jane Phillips Medical Center on May 19, 2008. (R. 393-95). She apparently left without being seen by a physician. (R. 395).

On May 20, 2008, Harris returned to Dr. Bumpus with a chief complaint of pain all over and a fever. (R. 217). It appears that she was given referrals to other physicians. *Id.*

Harris was evaluated by Alan L. Martin, M.D. with Tulsa Bone & Joint on May 21, 2008. (R. 233-34). Dr. Martin stated Harris' complaint as "I have pain all over my body." (R. 233). His examination showed multiple paired tender points, but no clear signs of active inflammatory arthropathy or myopathy. (R. 234). His plan was to proceed with a sleep study to rule out obstructive sleep apnea and to wait for pending laboratory studies. *Id.*

5

Harris was seen at Bluestem Cardiology in October 2008 with chest pain that was determined not to be cardiac-related and that was stated to be "most likely anxiety related." (R. 261-77).

Harris was seen by John Kelley, PA-C on October 23, 2008 as a new patient. (R. 281). A note states that she was scheduled to be seen by Dr. West in February 2009. *Id.* Her primary diagnosis was fibromyalgia pain, and she also complained of depression. *Id.* The diagnoses included situational anxiety stress depression disorder, fibromyalgia, chronic back pain, and morbid obesity, and Harris was prescribed Lortab, Xanax, and Lexapro. *Id.* She was seen again on November 20, 2008 for increased personal stressors and inability to work. (R. 282). The diagnoses included chronic back pain, fibromyalgias, situational stress anxiety depression disorder, and gastroesophageal reflux disease. *Id.* Her medications were adjusted, and she was referred to physical therapy. *Id.*

Harris was seen at the emergency room at Jane Phillips Medical Center on October 26, 2008, complaining of pain and dizziness. (R. 385-92). She was apparently diagnosed with a urinary tract infection and prescribed antibiotics. (R. 386).

Records reflect that Harris attended physical therapy from December 4, 2008 through March 4, 2009. (R. 290-370).

Harris was seen by Kelley on February 5, 2009 for refill of her medications. (R. 380). The diagnoses include chronic back pain, "fibromyalgia,"[1] situational stress anxiety depression disorder, and chronic insomnia. *Id.* Her medications were adjusted. *Id.* Harris saw Matthew West M.D. in the same office on February 11, 2009 as a new patient. (R. 378-79). Dr. West

---

[1]The quotation marks are original in the treatment record. (R. 380).

6

stated that Harris was very pleasant, and he considered that she was completely reliable, she was genuinely hurting, and she just wanted to get better. (R. 378). Diagnoses were bronchitis, fibromyalgia, depression / anxiety, obesity, and elevated blood pressure. *Id.* He adjusted Harris' medications. *Id.*

Harris was seen by Kelley on February 25, 2009 for continued congestion, and Kelley diagnosed her with bronchitis and bronchopneumonitis. (R. 376). A chest x-ray taken that day was negative. (R. 377). Harris returned to see Kelley on March 23, 2009 with recently increased panic attacks, along with headaches and flare of fibromyalgias. (R. 375). Kelley diagnosed her with an acute panic attack and migraine headache, and she was given an injection of Nubain and Vistaril. *Id.* On April 3, 2009, Harris returned, complaining of extreme pain that was keeping her from sleeping. (R. 374). Kelley repeated the injection that he gave on March 23, and adjusted Harris' medications. *Id.* Harris returned on April 6, 2009 for anxiety symptoms. (R. 372). On April 30, 2009, she returned for pain, and she also stated that the last adjustment to her medications had left her too sleepy and drowsy in the mornings. (R. 371). Kelley adjusted her medications. *Id.*

Harris was seen at the emergency room at Jane Phillips Medical Center on May 11, 2009 with a chief complaint of throat pain and body aches. (R. 381-84). The diagnosis was viral sore throat, and she was discharged. (R. 383-84).

Harris was seen by Dr. West on June 10, 2009 for pelvic pain. (R. 422). A CT scan done the next day found suspected mild sigmoid diverticulosis and no other significant findings. (R. 421). Harris was seen at the emergency room at Jane Phillips Medical Center on June 28, 2009 complaining of severe pelvic pain. (R. 410). A CT scan of her chest found a 7 mm nodule in the middle lobe or one lung, and it was recommended to have a follow-up scan in 6-12 months. (R.

414). A CT of her pelvis showed a 2.8 cm left ovarian cyst. (R. 415). She was given pain medication and was discharged. (R. 412-13). Harris returned with continuing pelvic pain on June 30, 2009. (R. 402-07). Harris was given pain medication, but her husband requested more medication, and the physician refused. (R. 406). The record states that Harris left before the evaluation was complete. *Id.*

Ultrasound imaging of Harris' pelvis was done on July 1, 2009, with an impression of probable hemorrhagic left ovarian cyst. (R. 401). It was recommended to have a follow-up scan in 4-6 weeks. *Id.*

Harris also saw Dr. West on July 1, 2009, and he reviewed all of the laboratory results. (R. 419-20). On August 18, 2009, Harris returned to Dr. West with a complaint of feet swelling. (R. 417-18). Dr. West diagnosed her with edema and elevated blood pressure. (R. 417). Harris apparently also had a skin problem in her right arm pit, but the hand-written notes are difficult to decipher. (R. 417-18). On August 29, 2009, Harris' skin problem had improved, she did not have edema, and her blood pressure was normal. (R. 416).

On October 6, 2009, Harris returned to the Jane Phillips Medical Center emergency room, and she was diagnosed with pneumonia. (R. 429-34). She was given antibiotics and discharged. *Id.*

Harris followed up with Kelley on October 12, 2009, and she still had a fever and a cough. (R. 435). She also had a urinary tract infection, and she was given additional medication. *Id.*

The administrative transcript contains two progress notes from Grand Lake Mental Health Center in October 2009. (R. 442-44).

8

Harris was seen by agency consultant Minor W. Gordon, Ph.D. on September 2, 2008 for a psychological evaluation. (R. 235-38). Dr. Gordon assessed that Harris' activities of daily living were less than normal, her social-adaptive behavior was within normal limits, and her memory was intact. (R. 236). His Axis I[2] diagnosis of Harris was mild depression, not otherwise specified, secondary to her general medical condition. *Id.* Dr. Gordon's evaluation of Harris' global assessment of functioning ("GAF")[3] was 70. *Id.*

Agency nonexamining consultant Sharon Taber, Ph.D. completed a Psychiatric Review Technique Form dated September 8, 2008. (R. 239-52). Dr. Taber found that Harris' mental health impairments were not severe. (R. 239). For Listing 12.04, Dr. Taber noted Harris' mild depression, not otherwise specified, secondary to general medical condition. (R. 242). For the "Paragraph B Criteria,"[4] Dr. Taber found that Harris had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining

---

[2]The multiaxial system "facilitates comprehensive and systematic evaluation." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereafter "DSM IV").

[3]The GAF score represents Axis V of a Multiaxial Assessment system. *See* DSM IV at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id*. at 32. The GAF scale is from 1-100. A GAF score between 21-30 represents "behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." *Id*. at 34. A score between 31-40 indicates "some impairment in reality testing or communication . . . or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id*. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id*.

[4]There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") §12.00C. *See also Carpenter v. Astrue*, 537 F.3d 1264, 1268-69 (10th Cir. 2008).

concentration, persistence, or pace, with insufficient evidence of episodes of decompensation. (R. 249). In the "Consultant's Notes" portion of the form, Dr. Taber noted that Harris was not in mental health counseling, but took Trazodone to help with sleep. (R. 251). Dr. Taber then summarized the findings of Dr. Gordon's report. *Id.*

Agency nonexamining consultant Janet G. Rodgers, M.D. completed a Physical Medical Residual Functional Capacity Assessment dated September 8, 2008. (R. 253-60). Dr. Rodgers found that Harris could perform work at the light exertional level. (R. 254). In explanation, she described Harris' history of diffuse pain, and she summarized the examination of Dr. Martin in May 2008. *Id.* Dr. Rodgers also noted that Harris did light cleaning and meal preparation, and she shopped for short periods of time. (R. 254-55). Dr. Rodgers found no additional limitations. (R. 255-60).

Dr. West completed a one-page form titled "Medical Source Opinion of Residual Functional Capacity," together with a one-page diagram that appears to represent tender points for fibromyalgia evaluation, with both pages dated November 9, 2009. (R. 445-46). Dr. West indicated that Harris could infrequently sit, stand, or walk, and the form defined infrequently as 0-1 hours in an 8-hour work day. (R. 445). He indicated Harris could frequently lift or carry less than 10 pounds. *Id.* She could only infrequently use her arms for reaching, pushing, or pulling. *Id.* Harris could occasionally use her hands for grasping, handling, fingering, or feeling, and the form defined occasionally as 2-3 hours in an 8-hour work day. *Id.* Dr. West wrote on the form that Harris' "history, exam, lab, and radiographic findings" were consistent with a diagnosis of fibromyalgia. *Id.* He also stated that he considered her to be a reliable historian. *Id.*

10

**Procedural History**

Harris filed an application dated June 13, 2008, seeking supplemental security income benefits under Title XVI, 42 U.S.C. §§ 401 *et seq*. (R. 94-98). The application was denied initially and on reconsideration. (R. 58-61, 65-66). A hearing before ALJ Charles Headrick was held November 13, 2009 in Tulsa, Oklahoma. (R. 30-54). By decision dated December 18, 2009, the ALJ found that Harris was not disabled at any time through the date of the decision. (R. 11-17). On July 29, 2010, the Appeals Council denied review of the ALJ's findings. (R. 1-5). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 416.1481.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[5] *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

---

[5]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four,

11

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

At Step One, the ALJ found that Harris had not engaged in any substantial gainful activity since her application date of May 27, 2008. (R. 13). At Step Two, the ALJ found that Harris had severe impairments of right carpal tunnel syndrome, fibromyalgia, and obesity. *Id.* The ALJ found that Harris' depression was situational and mild, and he therefore found that it was not a

---

where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

severe impairment. *Id.* At Step Three, the ALJ found that Harris' impairments did not meet a Listing. (R. 13-14).

The ALJ determined that Harris had the RFC to do the full range of light work. (R. 14). At Step Four, the ALJ found that Harris was able to perform past relevant work as a receptionist and customer service representative. (R. 16). Therefore, the ALJ found that Harris was not disabled at any time from May 27, 2008, through the date of his decision. (R. 17).

### Review

While Harris raises several issues on appeal, the Court finds that the ALJ's decision must be reversed because it did not sufficiently address the opinion evidence of Dr. West. Because reversal is required on this issue, the other issues Harris raises on appeal are not addressed.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record. *Hamlin*, 365 F.3d at 1215. *See also* 20 C.F.R. § 404.1527(d)(2). Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004). The ALJ is required to give specific reasons for the weight he assigns to a treating physician opinion, and if he rejects the opinion completely, then he must give specific legitimate reasons for that rejection. *Id.*

Here, the ALJ was brief in summarizing the medical evidence, using only one paragraph to do so. (R. 15). He did not discuss the evidence of Harris' treatment by John Kelley, PA-C, a

13

Certified Physician Assistant in Dr. West's practice and by Dr. West himself. *Id.* The treatment of Harris by Kelley and Dr. West spanned from October 2008 through November 2009. (R. 280-89, 371-80, 416-28, 435-39, 445-46). During that period, Harris was seen by Kelley on 9 occasions, and by Dr. West on 5 occasions. *Id.* None of those 14 office visits were referred to or summarized by the ALJ. (R. 15).

The first reference the ALJ made to Dr. West stated that he had filled out a medical source statement indicating that Harris could not perform even sedentary work. *Id.* The ALJ then said that Dr. West "rarely" saw Harris, and she was "normally" seen by Kelley. *Id.* As stated above, Kelley saw Harris on 9 occasions, and Dr. West saw her on 5, and therefore the ALJ's view that Dr. West "rarely" saw Harris does not seem to be supported by the evidence. Especially given the questionable factual basis for the ALJ's reasoning, this is not a specific and legitimate basis for rejection of Dr. West's opinion evidence.

The only other statement[6] the ALJ made regarding why he rejected Dr. West's opinion is as follows:

> While the undersigned has carefully considered Dr. West's opinion, it cannot be given controlling weight because it is in conflict with Dr. West's own treatment records and inconsistent with the other substantial evidence as noted above.

(R. 15). This boilerplate provision adds nothing of substance to the ALJ's decision. *Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004) (boilerplate statements "[fail] to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered"). While the ALJ said

---

[6]The paragraph in which the ALJ discussed Dr. West's medical source statement contains a few sentences that make statements regarding the Social Security Administrations regulations and rulings on treating physician opinion. (R. 15). These statements, by themselves, are not objectionable, but without applying the principles they state to the specific facts of Harris' application for disability, they in no way constitute legitimate specific reasons for rejecting or discounting Dr. West's opinion evidence.

14

that Dr. West's opinion conflicts with his own treatment records, the ALJ did not mention any of those treatment records, and he gave no examples of any conflicts. The Court has reviewed all of these treatment records, and no glaring conflict is obvious to the Court. Without discussion and examples from the ALJ explaining this reasoning, the Court is deprived of the ability to give meaningful review of the ALJ's decision.

The second part of the language quoted above from the ALJ's decision, that Dr. West's opinion conflicted with "other substantial evidence as noted above" is equally unhelpful. As discussed, the ALJ's decision was brief in reviewing the medical evidence of record, giving only a one-paragraph summary. (R. 15). There is nothing about the evidence mentioned by the ALJ in his decision that affirmatively contradicts Dr. West's opinion evidence. Without a discussion of the facts and examples from the ALJ giving an explanation of his reasoning, the ALJ's reference to "other substantial evidence as noted above" is too vague to allow this Court to meaningfully review the ALJ's decision. *See Langley*, 373 F.3d at 1123 ("Because the ALJ failed to explain or identify what the claimed inconsistencies were between [the treating physician's] opinion and the other substantial evidence in the record, his reasons for rejecting that opinion are not 'sufficiently specific' to enable this court to meaningfully review his findings.").

The ALJ's decision must be reversed so that the ALJ can properly consider the treating physician opinion evidence of Dr. West.

Because the errors of the ALJ related to the opinion evidence require reversal, the undersigned does not address the remaining contentions of Harris. On remand, the Commissioner should ensure that any new decision sufficiently addresses all issues raised by Harris.

The undersigned emphasizes that "[n]o particular result" is dictated on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

## Conclusion

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 26th day of October, 2011.

_____
Paul J. Cleary
United States Magistrate Judge